IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

LINDSAY S. V. ROBINSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LINDSAY S., APPELLEE,

V.

ANDRE ROBINSON, APPELLANT.

Filed March 14, 2017.    No. A-16-835.

Appeal from the District Court for Douglas County: J. MICHAEL COFFEY, Judge. Reversed and remanded with directions to vacate.

Andre Robinson, pro se.

No appearance for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Andre Robinson appeals the district court's entry of a domestic abuse protection order against him. Robinson claims no evidence was received by the court showing that he engaged in abusive behavior. We agree and reverse and remand with directions to vacate the domestic abuse protection order.

## BACKGROUND

On June 27, 2016, Lindsay S. filled out a form "Petition and Affidavit to Obtain Domestic Abuse Protection Order" (petition) in the district court for Douglas County naming Robinson as the respondent. The form states that Lindsay is petitioning for a domestic abuse protection order pursuant to Neb. Rev. Stat. § 42-924 (Reissue 2016), that she and Robinson were parents of a minor child, A.R., age 12, and that Lindsay also had two other children not fathered by Robinson.

- 1 -

Lindsay requested a protection order prohibiting Robinson from: imposing any restraint upon her or her liberty; threatening, assaulting, molesting, or attacking her, or otherwise disturbing her peace; and telephoning, contacting, or otherwise communicating with her. She also requested temporary custody of A.R., and requested any other relief necessary to provide for the safety and welfare of herself and all three of her minor children. The petition reflects that Robinson resides at the "Lincoln Correction Center."

Lindsay's petition identifies four "recent incidents" of domestic abuse directed towards her and/or her children by Robinson. First, she alleged that in "April 2016," Robinson, who never had contact with "my 12 year old daughter," began threatening to take her (Lindsay) to court and "fight for visitations and talk to her [A.R.]." Lindsay claimed Robinson threatened "to use my past abusive relationship with my son's father to make me seem as an unfit mother. I was scared." Lindsay indicated she put A.R. on the phone and that Robinson "began threatening me about talking to her."

The second incident took place in "May 2016." Lindsay alleged that Robinson "would continuously call, send emails, and letters." She said she "felt scared" and told him whatever he wanted to hear, and she "began to feel unsafe at home because I began seeing his friends random places and they would tell him they saw me." Lindsay expressed concern that Robinson would "send people to follow me or my daughter."

The third incident is dated "June 2016." Lindsay claimed the calls were more frequent, that Robinson was trying "to manipulate my daughter's young mind," and that Robinson would scream at her (Lindsay) on the phone and make her cry. And then when talking to A.R., Robinson would say, "me and your mom are having disagreements[.] I don't mean to make your mom cry, I love you both, etc."

The fourth incident is identified as "June 11-17th 2016" and on the petition form states only, "He was sending mail." In an attachment to the form, Lindsay expanded on this fourth incident. She stated that Robinson had been sending letters to her parents' house but that Robinson told A.R. he was going to begin sending them to Lindsay's house. Lindsay stated that she never gave Robinson her address and that she told Robinson not to send anything to her house, yet she received two pieces of mail "since then." She stated, "He must have someone watching me. I don't feel safe in my home anymore. I know he is a criminal and is capable of getting things done, even behind bars." She further asserted:

> When I took the phone and told him not to send anything to my house, he yelled and asked if I had her on speakerphone, I said no. He asked why was I listening. Then said[,] "I'm not a pedophile." That was a disturbing comment. On Monday June 20th, 2016[,] he called and we argued on the phone. I put my daughter on the phone so he would not bother me for a week. At the end of the conversation, he asked her[,] "Do you know how to kiss?" Then he told her to blow him a kiss. That made her and me feel uncomfortable. That was the last time I put her on the phone. This has all got out of hand and I have to make sure my daughter is not to [sic] exposed to uncomfortable and unsafe conditions.

Lindsay then stated Robinson "would call her [A.R.] things such as 'gorgeous and beautifu[l]' which is the same things he would say to me. That would make her feel awkward."

Also, Robinson wrote a letter to A.R. "saying something along the lines of he got back from working out, and not everyone could 'stay in shape like her.'" Lindsay did not think that was appropriate to say to a child. Lindsay then went on to describe an event from "[a]pproximately 5 years ago," and incidents from 2003 or 2004 or earlier; all of which were too remote in time to have had any relevance to the pending matter. Finally, Lindsay noted that Robinson "called 20 times last night and already 13 times today," had called "over forty times in one day and sent numerous letters to my parent's [sic] house," and that she was going to call the warden of the prison to get Robinson to stop contacting her and A.R.

An "Ex Parte Domestic Abuse Protection Order" was entered on June 28, 2016, granting the relief requested in Lindsay's petition. A letter from Robinson dated July 23 was filed with the court on July 27. The letter indicates that he received a copy of the protection order but did not receive Lindsay's affidavit and he wished to have a copy to prepare for the hearing on August 11.

A hearing took place on August 11, 2016, with Lindsay present with counsel and with Robinson appearing by telephone. The following colloquy took place at the commencement of the hearing, with no one sworn in to testify:

> THE COURT: Are you resisting this, Mr. Robinson?
> [Robinson]: Yes, I am, Your Honor.
> THE COURT: You're sitting in prison; is that right?
> [Robinson]: That's correct.
> THE COURT: What's your sentence?
> [Robinson]: I've got a life sentence, Your Honor.
> THE COURT: What do you care if there's a protection order against you or not?
> [Robinson]: Because the whole process - because she's filed this - because it's a frivolous protection order, Your Honor. She's wasting the Court's time.

Robinson further stated that Lindsay was wasting the Court's time because "she isn't in fear of her life." Robinson said the allegations were "all false," and that he "never threatened her," and that he wanted to have communication with his daughter. The court asked Robinson if he had seen Lindsay's allegations and whether Robinson did the things she says he did. Robinson said, "I didn't do any of this. All of this is false. I never threatened her. This is all a tactic." Robinson said that he "told this one man" that he wanted to communicate with his daughter, and then "[s]he initiated contact" with him. (It is unclear here if "she" means A.R. or Lindsay, but a later discussion would suggest he means Lindsay.)

The district court then established that Lindsay and Robinson had never been married, and when Robinson confirmed there had never been a paternity action, the district court stated, "That means you have no parental rights." The court told Robinson he could file a paternity action and then try to get some relief from the court, but since Robinson has "never been deemed legally the father," Robinson had no rights for visitation. Robinson stated he was "planning on doing that process," and that Lindsay "initiated the contact with me, and she okayed for me to write, e-mail and call." Robinson stated that Lindsay reached out to him through a website called "accesscorrections.com" and that he and Lindsay have been in contact since November 2015. Lindsay acknowledged setting up this account, and that Robinson reached out to her through a

letter first, and then they started communicating back and forth. The court asked Lindsay, "Why would you do that if you're so terrified of him?" Lindsay's response was, "I hadn't spoke [sic] to him in years, and I guess I just kind of wanted to see how he was doing. It was just conversations back and forth at first. But then it started becoming uncomfortable around April when I started stating in the affidavit what was going on."

Robinson stated that when he and Lindsay first started talking, he told her he wanted a good relationship with A.R. He stated, "She contacted me. We have no other reason to communicate with each other, other than for our daughter. So when I did write, I would ask about our daughter." Robinson said he and Lindsay started talking on the phone, and that all the calls are recorded, "so it's not like I was making any threats towards her." The court asked Robinson if he was bothering Lindsay unnecessarily. Robinson said he had not, and that he was trying to come up with an agreement on visitation and phone call rights.

Lindsay said that when she and Robinson first started talking, it was not about their daughter. "And more or less after he realized that I wasn't going to have a relationship with him personally, then he started pushing the issue of talking to our daughter."

At this point (bearing in mind that no one has been sworn in to testify, nor any evidence offered and received), counsel for Lindsay acknowledged that it was "a unique situation" with Robinson being incarcerated, but "there is a concern here that [Robinson] is continuing to attempt to contact my client even after she filed for the protection order, even after he was served with the protection order." According to the attorney, Robinson sent a letter to Lindsay's mother, "intended for my client," expressing displeasure with the protection order. The attorney also indicated he had communicated with the prison to stop Robinson's communication and "there's only so much they can do."

Robinson again stated that "[t]he whole intention was for me to have a good relationship with my daughter." Robinson said the first time he ever talked to A.R. was on her 12th birthday, and he asked her if she would talk to him and if it was okay to write to her. According to Robinson, A.R. said "it was okay." Robinson said all of his calls were recorded.

At that point, the court stated it had "heard enough." The court confirmed Robinson's mailing address and indicated it would "take a look at everything and get you an order[.]" After Robinson hung up, Lindsay acknowledged she should not have contacted Robinson in the first place. The court indicated it would review everything, but in the meantime the order remained in effect. Court was adjourned at that point.

On August 16, 2016, an "Order Affirming Domestic Abuse Protection Order" pursuant to Neb. Rev. Stat. §§ 42-924 and 42-925 (Reissue 2016) was entered. The order states that evidence was adduced and that the petitioner has shown that the respondent "attempted to cause, or intentionally, knowingly, or recklessly caused, bodily injury to the petitioner"; or "by means of a credible threat, placed the petitioner in fear of bodily injury"; or "engaged in sexual contact or sexual penetration without consent as defined by Neb. Rev. Stat. § 28-318 [(Reissue 2016)]." The court affirmed the ex parte domestic abuse protection order issued on June 28, 2016, and ordered it to remain in full force and effect for one year from that date, unless modified by order of the court.

## ASSIGNMENT OF ERROR

Robinson assigns that the district court erred in granting a domestic abuse protection order against him because his actions did not constitute abuse under Neb. Rev. Stat. § 42-903(1) (Reissue 2016).

## STANDARD OF REVIEW

A protection order pursuant to § 42-924 is analogous to an injunction. *Torres v. Morales*, 287 Neb. 587, 843 N.W.2d 805 (2014). Thus, the grant or denial of a protection order is reviewed de novo on the record. *Id*. In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id*. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## ANALYSIS

Robinson argues in his brief that there was no evidence offered that he threatened to harm Lindsay or her children. He says, "At most, Robinson threatened to take [Lindsay] to court to ask for visitations of their daughter . . . but those threats if it could be considered a threat, did not meet the requirements for a domestic abuse protection order." Brief for appellant at 6. Robinson also argues that neither he nor Lindsay were sworn in before giving testimony, and further, Lindsay's petition was never offered into evidence.

Section 42-924 of the Protection from Domestic Abuse Act (Act) permits "[a]ny victim of domestic abuse" to file a petition and affidavit for a protection order. The Act defines "abuse" in pertinent part as follows:

> [T]he occurrence of one or more of the following acts between household members: (a) Attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument; (b) Placing, by means of credible threat, another person in fear of bodily injury. . . . ; or (c) Engaging in sexual contact or sexual penetration without consent as defined in section 28-318.

§ 42-903(1). Persons who have a child in common whether or not they have been married or lived together at any time fall under the definition of "household members." § 42-903(3). A "credible threat" is defined by § 42-903(1)(b), as:

> a verbal or written threat, including a threat performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct that is made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the person making the threat had the intent to actually carry it out.

In *Linda N. v. William N.*, 289 Neb. 607, 614, 856 N.W.2d 436, 443 (2014), the respondent sent "'morally abhorrent'" texts to his minor child which contained "crude language and excessive name-calling." There was no reference to physical harm occurring or being threatened, and there was no evidence of past physical abuse. The Nebraska Supreme Court stated, "We find the 'credible threat' language in § 42-903 to mean that the evidence at trial must include some threat of intentional physical injury or any other physical threat." *Id.* The court concluded the respondent's conduct did not fit within the statutory definition of abuse under § 42-903(1) and reversed the district court's granting of a domestic abuse protection order.

In *Torres, supra*, the Nebraska Supreme Court found that a district court did not err in failing to issue a domestic abuse protection order because there was no intentional bodily harm inflicted on the petitioner, no evidence of any credible threats of harm, and no evidence of any nonconsensual sexual contact.

For a domestic abuse protection order to be entered in the present matter, Lindsay was required to prove that she was the victim of domestic abuse in that Robinson had attempted to cause or had intentionally and knowingly caused bodily injury with or without a dangerous instrument, § 42-903(1)(a), or placed her in fear of bodily injury by means of credible threat, § 42-903(1)(b), or engaged in sexual contact or penetration without consent, § 42-903(1)(c). However, no evidence was produced at the hearing. No one at the protection order hearing was sworn in to testify, nor were any exhibits offered for consideration by the court. Even though these types of proceedings are summary in nature, some evidence is necessary, as discussed next.

The Nebraska Supreme Court has stated that a contested factual hearing in protection order proceedings is a show cause hearing, in which the fact issues before the court are whether the facts stated in the sworn application are true. *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010). Such proceedings are summary in nature and a court "is justified in excluding evidence if its probative value is substantially outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* at 397, 778 N.W.2d at 432. However, some evidence must be presented, and "[w]e have said that evidence consists of facts admitted *at a trial* to establish or disprove the truth of allegations put in issue by the pleadings. And the allegations of a petition require proof by evidence incorporated in the bill of exceptions." *Id.* at 397-398, 778 N.W.2d at 432 (emphasis in original). The *Mahmood* court goes on to state that a

> prima facie case may be established by a form petition and affidavit. But the petition and affidavit cannot be considered as evidence until offered and accepted at the trial as such. The ex parte order does not relieve the petitioner of the burden to establish by a preponderance of the evidence the truth of the facts supporting a protection order.

*Id.* at 398, 778 N.W.2d at 433.

In *Mahmood, supra*, there was no sworn testimony or exhibits, only an informal discussion of the parties, including the reading of a written statement by the respondent. The trial court in that case concluded that the respondent's behavior was not "threatening," but that he was "bothering" the petitioner, and the court ordered the prior ex parte protection order to be left in place. The Nebraska Supreme Court reversed and remanded with directions to vacate the harassment protection order after finding the evidence insufficient to support the protection order, largely

because the "proceedings were so informal that there was no evidence properly admitted for the court's consideration." *Id*. at 397, 778 N.W.2d at 432.

In *Sherman v. Sherman*, 18 Neb. App. 342, 781 N.W.2d 615 (2010), this court considered the sufficiency of the evidence in a harassment protection order case. In *Sherman*, the petitioner's petition and affidavit were not received as evidence at trial. Although the court in that case attempted to take judicial notice of the allegations contained in the petition and affidavit, we noted that "a court may not take judicial notice of disputed facts," and therefore "the allegations contained in [the petitioner's] petition and affidavit were not evidence upon which the court could base its findings and were not properly considered by the court in making its determination." *Id*. at 348-349, 781 N.W.2d at 621.

Likewise in the case before us, the petition was not received into evidence, and could not be considered by the court in determining whether a domestic abuse protection order should issue. Additionally, there was no sworn testimony, and as concluded in *Mahmood, supra*, when the proceedings are so informal that there was no evidence properly admitted for the court's consideration, a protection order cannot be supported.

With no evidence properly offered at the protection order hearing to prove domestic abuse as defined at § 42-903(1), the district court erred in entering a domestic abuse protection order against Robinson and it must be vacated.

## CONCLUSION

The district court erred in entering a domestic abuse protection order against Robinson. We reverse and remand with directions to vacate the order.

REVERSED AND REMANDED WITH
DIRECTIONS TO VACATE.